**UNITED STATES of America, Respondent,**

v.

**John T. HUNTER, Jr., Petitioner.**

**Nos. 97 C 1970, 93 CR 318.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 2, 1997.

Jerry Kulewitch, Asst. U.S. Atty., U.S. Atty's Office, Chicago, IL, for U.S.

John T. Hunter, pro se.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

In January 1995 petitioner John T. Hunter, Jr., was convicted of conspiring to rob banks, of robbing sixteen banks, and of using or carrying a firearm during each of those robberies. *See* 18 U.S.C. §§ 371, 2113(a), (d), and 924(c)(1). His conviction was affirmed on appeal. *See United States v. Hunter,* 86 F.3d 679 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996). Hunter now moves pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentences for using or carrying firearms, § 924(c)(1), raising a number of constitutional and statutory arguments. For the reasons set forth below, the motion is denied.

### I. Procedural Default

A federal prisoner may move to vacate, set aside, or correct a sentence if he proves that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law." 28 U.S.C. § 2255. A petition under § 2255, however, may not be used to circumvent or substitute for a direct appeal. *See United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982). Accordingly, "errors not raised on direct appeal may not be raised in a § 2255 motion unless the defendant can demonstrate either:

(1) both good cause for his failure to raise the claims on direct appeal and actual prejudice from the failure to raise those claims, or (2) that the district court's refusal to consider the claims would lead to a fundamental miscarriage of justice." *McCleese v. United States*, 75 F.3d 1174, 1177 (7th Cir.1996) (citing *Reed v. Farley*, 512 U.S. 339, 114 S.Ct. 2291, 129 L.Ed.2d 277 (1994)).

Hunter did not assert any of the arguments in the instant petition in his direct appeal to the Seventh Circuit, so these arguments are defaulted unless one of the two exceptions applies. Hunter believes he qualifies for the cause and prejudice exception because his trial and appellate counsel were constitutionally ineffective.[1] To prove ineffective assistance, the defendant "must establish that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced by his attorney's error such that the result of the proceeding was rendered fundamentally unfair or unreliable." *Mason v. Godinez*, 47 F.3d 852, 855 (7th Cir.1995) (citing *Lockhart v. Fretwell*, 506 U.S. 364, 368–69, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993) and *Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984)). Ineffective assistance of counsel, if proven, can constitute "cause" for a procedural default. *See United States ex rel. Simmons v. Gramley*, 915 F.2d 1128, 1132 (7th Cir.1990) (citing *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645–46, 91 L.Ed.2d 397 (1986)).

Whether there was prejudice for purposes of avoiding a procedural default is intertwined with the question of whether a petitioner has shown ineffective assistance of counsel: both require us to determine whether counsel's putative errors affected the outcome. Accordingly, we discuss Hunter's claims below and conclude that they are meritless; as a result, not only has he failed to show prejudice—and thus fails to avoid procedural default of his constitutional claims—but in the alternative, his claims would fail on the merits even absent a procedural bar.

## II. Discussion

Hunter argues that the ineffectiveness of his trial and appellate counsel manifested itself in their failure to object to (or appeal from) five different errors at trial:[2] (1) improper jury instructions regarding liability under § 924(c); (2) unreliable photo-spread identifications and related in-court testimony regarding his participation in various robberies; (3) unconstitutional restrictions on his ability to cross-examine witnesses; (4) violation of the Double Jeopardy Clause; and (5) the unconstitutionality of U.S.S.G. § 2K2.4. We consider each argument in turn.

### A. Improper Jury Instructions

■ Hunter's first argument is that his attorneys failed to object to an improper jury instruction regarding liability under § 924(c).[3] To the extent we can understand

---

**1.** Hunter does not seriously contend that the "fundamental miscarriage of justice" prong is satisfied, and the facts do not support such a contention. In order to establish a fundamental miscarriage of justice, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995). Nothing in the instant petition would tend to establish Hunter's "actual innocence," so his hopes must rest on the cause and prejudice prong.

**2.** Hunter presents these five arguments simply as free-standing objections to his conviction—he does not expressly link them to his ineffective assistance of counsel argument, which appears at the end of his brief. If we took Hunter literally, we would be forced to conclude that all five arguments have been procedurally defaulted, since there is no reason why they could not have

been objected to at trial or raised on direct appeal. But because Hunter is proceeding pro se, we will construe his arguments generously, and assume that he meant to argue that his trial and appellate counsel were ineffective in failing to object to these alleged errors at trial or on direct appeal, and that this establishes cause for the procedural default.

**3.** 18 U.S.C. § 924(c) provides in pertinent part:

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years .... In

his argument,[4] he seems to believe that this court erroneously instructed the jury that he could be found liable for the offense of using or carrying a firearm during the commission of a crime of violence (§ 924(c)) if one of his co-conspirators committed such an offense in furtherance of the conspiracy, or if he aided or abetted another person in the commission of such an offense. *See* Pet.'s Br. at 5. Nowhere in his brief does Hunter dispute, as a factual matter, that he was an active participant in the bank-robbing conspiracy and that his co-conspirators violated § 924(c) by using *and* carrying firearms during the bank robberies.[5] Rather, his argument seems to be a strictly legal one—he denies that he can be charged with violating § 924(c) as either a co-conspirator or as an aider and abettor.

It is clear that the challenged jury instruction was proper. The Seventh Circuit has expressly held that conspirators can be held liable for violations of § 924(c) by their co-conspirators. *See United States v. Gironda*, 758 F.2d 1201, 1211–12 (7th Cir.1985). In *Gironda*, one conspirator had violated § 924(c) by carrying a firearm during a conspiracy to steal money from a bank. The court considered the doctrine articulated in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), and interpreted it "to mean that each conspirator may be 'liable for overt acts of every other conspirator done in furtherance of the conspira-

cy.'" *Gironda*, 758 F.2d at 1211 (quoting *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir.1981), and collecting cases). Under this theory, the court held the co-conspirators liable under § 924(c) even though they had not personally used or carried firearms during the offense. Since *Gironda*, the Seventh Circuit has continued to impose liability on co-conspirators for their colleagues' violations of § 924(c). *See, e.g., United States v. Monroe*, 73 F.3d 129, 132 (7th Cir.1995); *United States v. Sandoval–Curiel*, 50 F.3d 1389, 1394–95 (7th Cir.1995); *United States v. Gutierrez*, 978 F.2d 1463, 1467–68 (7th Cir.1992).

It is likewise clear that a person can be held liable for aiding and abetting a violation of § 924(c). "Aiding and abetting liability under 18 U.S.C. § 2 has been routinely applied in conjunction with 18 U.S.C. § 924(c) to convict individuals of 'aiding and abetting in using or carrying a firearm.'" *United States v. Golden*, 102 F.3d 936, 945 (7th Cir.1996) (quoting *United States v. Price*, 76 F.3d 526, 529 (3d Cir.1996)). Hence, there was nothing improper in this court's jury instruction indicating that the jury could find Hunter liable under § 924(c) under either conspiracy or aiding and abetting theories. Hunter's trial and appellate attorneys thus committed no error in failing to object to this instruction.[6]

the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years .... Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried.

4. Hunter's argument on this issue consumes 22 pages of his 89-page brief. Although these pages are replete with references to the record and to federal cases and statutes, it is difficult to determine the precise nature of Hunter's problem with our jury instructions.

5. To the contrary, Hunter avers that had he testified, he "would have explained to the jury that my responsibilities included selecting 'target' banks, selecting escape routes, selecting lo-

cations from which to steal autos, *providing the outfits and weapon[s] for the robberies,* and providing clothing and a place to live for those recruited." Pet.'s Br. at 24 (emphasis added).

6. Much of the discussion in Hunter's brief focuses on his belief that other subsections of § 924 besides § 924(c)(1) appear to provide penalties for conspiring to commit or aiding and abetting the commission of a violation of § 924(c). *See, e.g.,* 18 U.S.C. § 924(*o*) ("A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years ...."); § 924(h) (providing a penalty of up to 10 years for anyone who "knowingly transfers a firearm, knowing that such firearm will be used to commit a crime of violence"). Hunter argues that application of the co-conspirator-liability or aider-and-abettor doctrines to crimes under § 924 would render these provisions superfluous. This statutory interpretation is flawed. For instance, § 924(*o*) punishes persons who conspire to violate § 924(c); this is quite different from imposing *Pinkerton* liability on a person who conspired

### B. Unreliable Witness Identification and Testimony

Hunter's second argument is that his attorneys were ineffective for failing to prevent the introduction into evidence of "eyewitness photospread identifications which were unreliable," as well as the subsequent unreliable in-court testimony of those eyewitnesses. *See* Pet.'s Br. at 28. It is well established that when a pretrial identification procedure is "unnecessarily suggestive and conducive to irreparable mistaken identification," the procedure may deprive a defendant of due process. *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972–73, 18 L.Ed.2d 1199 (1967). Moreover, a subsequent in-court identification of the defendant by a witness who participated in an unduly suggestive identification procedure is inadmissible if there is a "very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). In making this second inquiry, "reliability is the linchpin in determining the admissibility of identification testimony," *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), and the Court has set forth a five factor test for lower courts to apply in assessing reliability, *see id.* But it is important to remember that suggestiveness and reliability are two distinct inquiries, and "[i]f a defendant fails to show that a photo display was unnecessarily suggestive . . . we need not consider whether the identification was otherwise reliable." *United States v. Sleet*, 54 F.3d 303, 309 (7th Cir.1995); *see also United States v. Donaldson*, 978 F.2d 381, 387 (7th Cir.1992); *United States v. Johnson*, 859 F.2d 1289, 1294 (7th Cir.1988).

In this case, Hunter has failed to make the necessary showing of a suggestive photo array. His only real argument as to how the array was suggestive is that five of the witnesses who identified him—Jennifer and Barbara Taglienti, Kevin Grond, Aaron Wetzel, and Steven Smith—may have seen his picture on television prior to selecting his picture from the government's photo arrays. *See* Pet.'s Br. at 44, 46, 47, 62.[7] The Seventh Circuit considered and rejected a similar argument in *Johnson, supra.* In *Johnson,* the photo used in the photo array from which witnesses identified the defendant had been "widely circulated" and shown on television in the community where the witnesses lived. *See id.* at 1292–93. Johnson argued that it was unconstitutional "for the police to use in an identification procedure a photograph that they themselves had earlier distributed publicly." *Id.* at 1296. The court disagreed, and stated that "[m]erely to create a risk that a witness may see a publicly distributed photo does not automatically create a substantial likelihood of subsequent irreparable misidentification." *Id.* Since the public airing of the photograph was not impermissibly suggestive, the court found that the question of the reliability of the identifications was one for the jury to resolve. *Id.* This case is similar:[8]

---

to violate 18 U.S.C. § 2113, but whose co-conspirators then violated § 924(c). In the latter case, the offender is subject to a form of vicarious liability resulting from his participation in the more general conspiracy; in the former, the liability is direct and results from a specific conspiracy to violate § 924(c). Moreover, the aiding and abetting statute, 18 U.S.C. § 2, imposes a different and broader type of liability on participants in gun-related criminal activity than any particular provision of § 924. No redundancy is created by applying 18 U.S.C. § 2 or the *Pinkerton* doctrine to § 924.

7. Hunter also asserts that "the FBI made unduly suggestive comments, pressured the Taglientis by showing up announced, [and] let these two witnesses view the photospreads together," Pet.'s Br. at 50, but these assertions all either unsupported, immaterial, or both. First, Hunter never identifies a single "unduly suggestive comment"

made by any FBI agent. Although the FBI agent meeting with Barbara Taglienti apparently told her that a suspect had been arrested, *see* Tr. at 600, there is no evidence suggesting that this information influenced her selection of Hunter's picture. Second, even assuming the FBI agents showed up "unannounced" at the Taglienti residence, we fail to see how this could have "pressured" them to identify Hunter from the photo arrays. Finally, Hunter's assertion that the two Taglientis viewed the photo arrays together is contradicted by the record: Jennifer Taglienti specifically denied that her mother or anyone else was "right there with her" when she viewed the photos—she stated that it was "just me and the agent," Tr. at 623–24.

8. Admittedly, the two cases are not identical. In *Johnson,* the witnesses denied seeing the televised photos of the defendant prior to selecting him from the photo array, whereas in this case it

Hunter cannot establish suggestiveness simply by claiming that photographs of him were publicly aired on television or in the print media at some time prior to the witnesses' identifications of him. The reliability of the witnesses' identifications was a matter appropriately left to the jury.[9]

### C. Limitation on Cross–Examination

Hunter's third argument is that his appellate counsel was ineffective for failing to appeal this court's limitation on defense counsel's cross-examination of eyewitnesses Jennifer Taglienti and Aaron Wetzel. He believes that the limitation deprived him of his Sixth Amendment right to confront witnesses and was erroneous under the Federal Rules of Evidence. *See* Pet.'s Br. at 65. In particular, Hunter objects to three instances where defense counsel was prevented from questioning Taglienti and Wetzel regarding prior statements that were allegedly inconsistent with their in-court testimony. *See id.* at 65–66. Hunter's arguments are without merit.

The Confrontation Clause establishes the right of an accused not only to physically confront a witness against him, but to have an opportunity to cross-examine. *See Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986). The Confrontation Clause, however, "guarantees only an opportunity for a thorough and effective cross-examination, 'not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *United States v. Sasson*, 62 F.3d 874, 882 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 953, 133 L.Ed.2d 876 (1996) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294–95, 88 L.Ed.2d 15

(1985) (per curiam)). As long as the defendant's right to effective cross-examination is preserved, "the district court retains wide latitude to impose reasonable limits on the scope and extent of cross-examination 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety or interrogation that is repetitive or only marginally relevant.'" *Id.* (quoting *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435).

Although the Supreme Court has never comprehensively enumerated the ways in which a defendant might establish a violation of the Confrontation Clause, the Court has generally viewed the ability of the defendant to expose a witness' biases as the core interest protected by the clause:

> We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in an otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'

*Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1435 (quoting *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974)); *see also Yancey v. Gilmore*, 113 F.3d 104, 108 (7th Cir.1997) (limitations on a party's ability to challenge the credibility of a witness in ways other than showing bias do not implicate the Confrontation Clause); *Sasson*, 62 F.3d at 882 (describing the opportunity to expose witness bias as the "core function" of the Confrontation Clause). The Supreme Court has defined bias as "the rela-

---

seems that at least one identification witness (Kevin Grond) saw the televised images of the defendant, *see* Pet.'s Br. at 47. But other witnesses in this case specifically denied seeing Hunter's picture prior to choosing him from a photo array. *See, e.g.,* Tr. at 626 (J. Taglienti); Tr. at 770–71 (Wetzell). Also, in *Johnson* the police used the exact same photo in the array as had been shown on television, while in this case there is no evidence or suggestion that the photos were the same. Thus, the pretrial circulation of photos was no more suggestive in this case than it was in *Johnson* —it was, at least arguably, less so.

**9.** We note that it is rather odd for Hunter to raise this photo array argument—since he concedes that he was a member of the conspiracy, he is liable for any robberies committed in furtherance of the conspiracy even if he personally was not the robber. Thus, Hunter's sentence would remain the same even if we were to conclude that all witness identifications of him were improperly admitted and that there was insufficient other evidence to convict him of robbing the banks. But because Hunter was technically convicted of robbing the banks (as well as conspiring to do so) we find it prudent to address his arguments anyway.

tionship between a party and a witness that might lead a witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest." *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984); *see also Sasson,* 62 F.3d at 883 n. 6.

■ In this case, Hunter does not suggest that this court's limitations on his cross-examination of government witnesses prevented him from exposing their biases or their motives in testifying. Instead, he merely objects to three instances where defense counsel was limited—on hearsay grounds—in questioning witnesses about details of their in-court testimony that varied from or were inconsistent with their sworn prior statements. *See* Pet.'s Br. at 66–67. This does not amount to a violation of the Confrontation Clause.

■ Moreover, even if Hunter could establish that we committed either constitutional or statutory error in limiting the cross-examination of Taglienti and Wetzel in these three instances, such error was harmless. Harmless error analysis in this setting requires us to consider the "error" in relation to "the importance of the witness' testimony to the prosecution's case, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, and the overall strength of the prosecution's case." *Sasson,* 62 F.3d at 885 (citing *Van Arsdall*). The testimony of Taglienti

and Wetzel was corroborated by other witnesses: Taglienti was not the only witness identifying Hunter as the perpetrator of the M & I Bank robbery, *see* Tr. at 601, nor was Wetzel the only witness regarding the Valley Bank robbery, *see* Tr. at 739–40. The testimony of all of these witnesses was consistent with the government's abundant evidence of Hunter's involvement in the conspiracy—involvement which Hunter now admits, *see* Pet.'s Br. at 23–24—such as notebooks with his handwriting, guns with his fingerprints, maps in his possession detailing the locations of victim banks and potential getaway routes, and clothing that he was wearing at the time of his arrest that matched the clothing worn by the robber. ' *Cf.* Tr. at 159–76 (government's opening statement, summarizing the evidence it planned to present). And as discussed earlier Hunter's convictions under § 924(c) are equally valid whether he was the actual bank robber or merely a conspirator.[10] Thus, appellate counsel's failure to object to this court's limitations on cross-examination, if error at all, was harmless.

### D. Double Jeopardy

■ Hunter's penultimate argument is that his attorneys were ineffective for failing to argue that § 924(c), which punishes using or carrying a firearm during the commission of a crime of violence, violates the Double Jeopardy Clause if applied to persons convicted of bank robbery under 18 U.S.C. §§ 2113(a), (d).[11] The Seventh Circuit has squarely rejected this precise argument:

---

**10.** At the conclusion of his arguments related to the limitations placed on defense counsel's cross-examination, Hunter requests only that this court "reverse all the § 924(c)(1) convictions," Pet.'s Br. at 69, not his bank robbery convictions.

**11.** 18 U.S.C. § 2113 provides:

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or
Whoever enters or attempts to enter any bank, credit union, or any savings and loan associa-

tion, or any building used in whole or in part as a bank, credit union, or as a savings and loan association, with intent to commit in such bank, credit union, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank, credit union, or such savings and loan association and in violation of any statute of the United States, or any larceny—
Shall be fined under this title or imprisoned not more than twenty years, or both.
. . . .
(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined under this title or imprisoned not more than twenty-five years, or both.

We proceed to the question of whether punishment for a violation of both §§ 924(c) and 2113(d) is prohibited by the Double Jeopardy Clause of the Constitution. Recent Supreme Court precedent is dispositive of this question.

In *Missouri v. Hunter,* 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the Supreme Court held unequivocally that where, as here, Congress "specially authoriz[es]" cumulative punishments for even the same offense, the Double Jeopardy Clause is not offended. *Id.* at 367, 103 S.Ct. at 678–79 (citing *Whalen v. United States,* 445 U.S. 684, 693, 100 S.Ct. 1432, 1438–39, 63 L.Ed.2d 715 (1980)). More specifically, the Court in *Hunter* held that with respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." 459 U.S. at 366, 103 S.Ct. at 678. Our earlier discussion of the 1984 amendment to § 924(c) establishes the clear intent of Congress to authorize cumulative punishments for those who violate § 2113(d) while possessing a firearm. Because § 924(c) satisfies the litmus test of legislative intent articulated in *Missouri v. Hunter,* the consecutive sentences imposed on [the defendant] do not offend the Double Jeopardy Clause.

*United States v. Harris,* 832 F.2d 88, 90–91 (7th Cir.1987). The *Harris* panel noted that two other circuits concurred with this reasoning, *see id.* at 91 (citing *United States v. Doffin,* 791 F.2d 118 (8th Cir.1986), and *United States v. Gonzalez,* 800 F.2d 895 (9th Cir.1986)), and a number of other circuits have subsequently expressed their agreement. *See United States v. Lanzi,* 933 F.2d 824, 825–26 (10th Cir.1991); *United States v. Moore,* 917 F.2d 215, 229–30 (6th Cir.1990); *United States v. Holloway,* 905 F.2d 893, 895 (5th Cir.1990); *United States v. Shavers,* 820

F.2d 1375, 1378 (4th Cir.1987). It was not error for Hunter's trial and appellate attorneys to fail to raise this argument: in fact, to raise it would have been sanctionable in light of the controlling precedent to the contrary.[12]

### E. Constitutionality of USSG § 2K2.4

■ Hunter's final argument is that his attorneys should have argued that the U.S. Sentencing Commission violated the Constitution in enacting § 2K2.4 because it exceeded the authority granted it by Congress pursuant to 28 U.S.C. § 994. *See* Pet.'s Br. at 78; 28 U.S.C. § 994(a) (empowering the Sentencing Commission to promulgate "guidelines ... for use of a sentencing court in determining the sentence to be imposed in a criminal case"). To the extent we can understand his argument, Hunter seems to believe that the Commission somehow defied the will of Congress in permitting multiple convictions under § 924(c) to be sentenced consecutively. *See* Pet.'s Br. at 79. It is true that the Commission must obey the expressed wishes of Congress in drafting sentencing provisions—such mandatory obedience is the reason why the Supreme Court ruled that Congress' delegation of authority to the Sentencing Commission was permissible in the first place. *See Mistretta v. United States,* 488 U.S. 361, 372–74, 109 S.Ct. 647, 654–56, 102 L.Ed.2d 714 (1989). But it could not be more clear that the Commission obeyed the will of Congress in drafting § 2K2.4: that provision simply indicates that sentences for violations of § 924(c) should be those mandated by the statute itself. *See* U.S.S.G. § 2K2.4(a). Under the Sentencing Guidelines, sentences for using or carrying a firearm during the commission of a crime of violence will conform precisely to Congress' intent, as made manifest in its statute.

### III. Conclusion

For the foregoing reasons, Hunter's motion to vacate, set aside, or correct his sen-

12. The government also neglected to refer us to any of the seven circuit court cases—including the Seventh Circuit case (*Harris*)—that were directly on point with respect to the double jeopardy argument. Instead, the government argued that the application of § 924(c) to persons convicted of bank robbery does not violate the Double Jeopardy Clause under the familiar *Blockbur-* *ger* "separate elements" test. *See* Govt.'s Br. at 15–17. But it is not necessary to apply the *Blockburger* test where the intent of the legislature is clear, as it is in this case. *See Missouri v. Hunter,* 459 U.S. 359, 367–69, 103 S.Ct. 673, 678–80, 74 L.Ed.2d 535 (1983); *Simpson v. United States,* 435 U.S. 6, 11–12, 98 S.Ct. 909, 912–13, 55 L.Ed.2d 70 (1978).

tence pursuant to 28 U.S.C. § 2255 is denied. Hunter's motion for appointment of counsel is denied as moot.   It is so ordered.